IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF TEXAS
DALLAS DIVISION

| | | |
|---|---|---|
| ROBERT JONES, | § | |
| | § | |
| Plaintiff, | § | |
| | § | |
| v. | § | Civil Action No.  3:13-CV-0097-P-BH |
| | § | |
| CAROLYN W. COLVIN, ACTING | § | |
| COMMISSIONER OF THE SOCIAL | § | |
| SECURITY ADMINISTRATION, | § | |
| | § | |
| Defendant. | § | Referred to U.S. Magistrate Judge |

## MEMORANDUM OPINION AND ORDER

Pursuant to the consent of the parties and the order of reassignment dated November 5, 2013, this case has been transferred for the conduct of all further proceedings and the entry of judgment. Before the Court are *Plaintiff's Brief on Appeal*, filed April 16, 2013 (doc.  13), and *Defendant's Response Brief*, filed May 15, 2013 (doc.  14).   Based on the relevant filings, evidence, and applicable law, the Commissioner's decision is **AFFIRMED**.

## I.  BACKGROUND[1]

### A.    Procedural History

Robert Jones (Plaintiff) seeks judicial review of a final decision by the Acting Commissioner of Social Security (Commissioner) denying his claim for supplemental security income (SSI) under Title XVI of the Social Security Act.  (R. at 135.)  Plaintiff applied for SSI on March 10, 2010, alleging disability beginning September 5, 2007.  (*Id.*)  His claim was denied initially and upon reconsideration.  (R. at 34.)  Plaintiff requested a hearing before an Administrative Law Judge

---

[1] The background comes from the transcript of the administrative proceedings, which is designated as "R."

(ALJ), and personally appeared and testified at a hearing held on October 26, 2011. (*Id.*) On December 16, 2011, the ALJ issued a decision finding Plaintiff not disabled. (R. at 31.) Plaintiff appealed, and the Appeals Council denied his request for review on November 26, 2012, making the ALJ's decision the final decision of the Commissioner. (R. at 1–4.) Plaintiff timely appealed the Commissioner's decision pursuant to 42 U.S.C. § 405(g). (*See* doc. 1.)

## B.    Factual History

### 1.    Age, Education, and Work Experience

Plaintiff was born in 1967, and was 44 years old at the time of the hearing before the ALJ. (R. at 50.) He obtained a GED and had past relevant work as a telephone solicitor. (R. at 50, 63.)

### 2.    Medical, Psychological, and Psychiatric Evidence

Maria C. Robinson, M.D., saw Plaintiff at Parkland Memorial Hospital (Parkland) on February 18, 2010, for complaints of pain in his left leg for the prior two weeks. (R. at 213.) Plaintiff reported that he'd had surgery on his left leg and knee in 2007. (*Id.*) He had a normal range of musculoskeletal motion, but Dr. Robinson noted that a trace of swelling at ankles, crepitus[2] on both knees, and tenderness to palpation on his left knee with no distress. (R. at 213-14.) He prescribed Plaintiff Maxzide, Ibuprofen, and Flexeril. (R. at 214.)

On March 1, 2010, psychiatrist Kendall Brown at Dallas Metrocare Services (Metrocare) completed a psychiatric diagnostic interview exam of Plaintiff. (R. at 216-221.) Plaintiff reported that he was stabbed five times in 2005, hit by a car in 2007, and assaulted in 2008. (R. at 218.) He complained he could not sleep and had visual and auditory hallucinations. (R. at 219.) Dr. Brown

---

[2]Crepitus is "[a] grating sound or sensation produced by friction between bone and cartilage or the fractured parts of a bone." OXFORD DICTIONARIES, http://www.oxforddictionaries.com/us/definition/american_english/crepitus (last visited Mar. 17, 2014).

found Plaintiff cooperative and oriented.  (R. at 219.)  His thought process was organized, and his judgment and insight were fair.  (R. at 219-20.)  Dr. Brown noted, however, that Plaintiff's functional impairment was significant, and he thought that it was probable that Plaintiff had "extensive PTSD."  (R. at 216, 221.)  Plaintiff had never received antidepressant treatments prior to the visit, and Dr. Brown prescribed him hydroxyzine, Zoloft, and Risperdal.  (R. at 218.)

On March 22, 2010, Dr. Brown conducted a routine follow-up meeting.  (R. at 224-28.) Plaintiff reported that he felt his ex-girlfriend might be following him, even though he'd had no contact with her for five years, but Dr. Brown concluded that there was no sign of psychotic features.  (R. at 226.)  He found Plaintiff to be cooperative and oriented, his thought process was organized, and his judgment and insight were fair.  (R. at 226-27.)  Plaintiff's functional impairment had improved from significant on March 1 to moderate.  (R. at 224.)  Dr. Brown noted that PTSD was probably linked to Plaintiff's waking at night with panic.  (R. at 227.)

On May 14, 2010, Tamika L. Perry, D.O., P.A. a state agency medical consultant (SAMC), saw Plaintiff for an internal medicine consultative exam for disability evaluation.  (R. at 230.)  In her report, she noted that Plaintiff had a deformed bone in his right leg and a rod in his left knee as a result of a broken leg in 1994 and a car accident in 2007.  (R. at 230-31.)  She found Plaintiff's muscle strength was 4/5 on left knee flexion/extension, but "[o]therwise muscle strength [was] 5/5 in bilateral upper and lower extremities."  (R. at 231.)  Dr. Perry found that Plaintiff's left calf circumference was 44 cm and his right calf circumference was 41.5 cm.  (R. at 231.)  She then opined that Plaintiff's limitations were the following: sit, stand/move for limited periods of time; lift/carry objects less than 10 pounds; hear and speak; and below average bilateral grip strength, but able to reach, handle, finger, and feel objects.  (R. at 231.)  Dr. Perry also observed that Plaintiff did

not use a cane to ambulate during the physical exam, and that he had a slow gait with limited movement of the left leg.  (*Id.*)

On June 1, 2010, Plaintiff saw Muhammad Anwer Nasir, M.D., at Parkland as a new patient. (R. at 319-22.)  Plaintiff's chief complaints were pain in his left knee and back.  (R. at 319.)  Dr. Nasir prescribed him Ibuprofen, Cyclobenzaprine, and Maxzine.  (*Id.*)  He noted that Plaintiff had a surgery for knee replacement and tibial fracture in 2007, which caused his chronic pain in his back and left knee.  (R. at 321.)  Dr. Nasir observed crepitus in Plaintiff's left knee and tenderness in his right ankle.  (*Id.*)  Dr. Nasir ordered an x-ray on Plaintiff's left knee.  (R. at 322.)

Dr. Perry opined, based on Plaintiff's left knee x-ray from June 10, 2010, that there were "moderate degenerative changes and chronic bony deformity due to past fracture, small effusion," and the presence of multiple bony loose bodies, causing Plaintiff's pain, locking up, and swelling. (R. at 231.)

On June 10, 2010, Lulu Tenorio, M.D, compared the x-ray with the July 16, 2008 x-ray of Plaintiff's left knee.  (R. at 322.)  Dr. Tenorio observed degenerative changes in medial and patellofemoral compartments of Plaintiff's left knee, with loose bodies in the posterior of the left knee joint space.  (*Id.*)  A previously noted tibial plateau fracture was observed, and no hardware complication was found.  (*Id.*)

On July 1, 2010, Barbara Susanne Fletcher, Psy.D, an SAMC, conducted a clinical interview for disability evaluation.  (R. at 233-38.)  Dr. Fletcher diagnosed Plaintiff with major depressive disorder, with severe psychotic features–provisional.  (R. at 237.)  She gave Plaintiff a global

assessment of functioning (GAF) of 50.[3]  (R. at 238.)

On July 21, 2010, Matthew Snapp, Ph.D., an SAMC, completed a mental residual functional capacity (RFC) assessment (MRFC).  (R. at 239-41.)  He noted in Section I of the MRFC that Plaintiff's medical history showed that he was moderately limited in five mental work-related abilities, including the ability to understand, remember, and carry out detailed instructions, maintain attention and concentration for extended periods, and make simple work-related decisions; he was not significantly limited in 15 abilities, including the ability to understand, remember, and carry out very short and simple instructions, sustain an ordinary routine without special supervision, and complete a normal workday and workweek without interruptions from psychologically based symptoms. (R. at 239-40.) Dr. Snapp concluded that Plaintiff "can understand, remember, and carry out detailed but not complex instructions, make decisions, attend and concentrated [sic] for extended periods, accept instructions, and respond appropriately to changes in routine work setting."  (R. at 241.)

Dr. Snapp also completed a Psychiatric Review Technique form (PRTF).  (R. at 243-56.) Dr. Snapp diagnosed Plaintiff with major depressive disorder.  (R. at 246.)  He opined that Plaintiff had no restriction on daily living activities, no difficulties in maintaining social function, and had no episodes of decompensation of extended duration; but Plaintiff had mild limitation on maintaining concentration, persistence or pace.  (R. at 253.)  He observed that Plaintiff can administer his own medications, count money, make change, and cook and clean; he also had good

---

[3] GAF is a standardized measure of psychological, social, and occupational functioning used in assessing a patient's mental health.  *See Boyd v. Apfel*, 239 F.3d 698, 700 n. 2 (5th Cir. 2001).  A GAF score of 41–50 indicates "[s]erious symptoms (e.g., suicidal ideation, severe obsessional rituals, frequent shoplifting) OR any serious impairment in social, occupational, or school functioning (e.g., no friends, unable to keep a job)."  *American Psychiatric Ass'n, Diagnostic and Statistical Manual of Mental Disorders* (DSM–IV–TR) p. 32 (4th ed. 1994).

insight to his conditions and good judgment.  (R. at 255.)  He concluded that Plaintiff's "alleged limitations due to depression are partially supported by the medical and other evidence of record[, but his] alleged severity and limiting effects from the impairment are not wholly supported." (*Id.*)

On August 5, 2010, Frederick Cremona, M.D., an SAMC, reviewed Plaintiff's medical file and completed a physical RFC assessment.  (R. at 257-64.)  He opined that Plaintiff had external limitations as follows: occasionally lift and carry 20 pounds, frequently lift and carry 10 pounds, stand or walk at least two hours in an eight-hour workday, sit for a total of about six hours in an eight-hour workday, and unlimited in pushing and pulling the load shown for lift and carry.  (R. at 258.)  He also opined that Plaintiff had the following postural limitations: occasionally climb a ramp or stairs; never climb a ladder, rope, or scaffolds; frequently balance, stoop, and crouch; occasionally kneel and crawl.  (R. at 259.)  He observed that Plaintiff walked without his cane, albeit with a slow gait.  (R. at 264.)  His grip strength was weak, but he was able to write with a pen, "showing the ability to handle, finger, and feel objects." (*Id.*)  He concluded that Plaintiff's limitations were not wholly supported.  (*Id.*)

On October 8, 2010, Richard Campa, Ph.D., reviewed the medical records and affirmed Dr. Snapp's July 21, 2010 assessment of both the MRFC and PRTF.  (R. at 266-67.)

On October 14, 2010, Andrea Fritz, M.D., reviewed the medical records and affirmed Dr. Cremona's August 5, 2010 physical RFC assessment.  (R. at 265.)

On August 8, 2011, Aurelia Buju, an advanced practice nurse at Metrocare, noted that Plaintiff's diagnoses were major depressive disorder without psychotic features, post traumatic stress disorder, and insomnia with sleep apnea.  (R. at 297.)  She gave Plaintiff a GAF score of 42.  (*Id.*)  She also noted that Plaintiff had moderate risk of harm, support needs, housing instability, and

"disturbance in . . . sleep, eating, and/or sexual interest that do not pose a serious threat to health," but that he had "[s]ubstantial barriers to employment[.]"  (*Id.*)  She made the exact same observation on October 17, 2011.  (R. at 312.)

On December 12, 2011, Plaintiff had a brief visit with a registered nurse at Metrocare.  (R. at 17-18.)  Plaintiff's mental status was stable, his insight and judgment were good, his appetite was normal, and he was sleeping well.  (R. at 17-18.)

### 3.      Hearing Testimony

On October 26, 2011, Plaintiff and a vocational expert testified at a hearing before the ALJ.  (R. at 47-65.)  Plaintiff was represented by an attorney.  (R. at 47.)

#### a.      *Plaintiff's Testimony*

Plaintiff testified that he was born on July 6, 1967, and had not worked since March 1, 2010.  (R. at 49-50.)  His reconstructed left knee, tibia and fibula bone of his right ankle, and depression kept him from working.  (R. at 51.)

Plaintiff lived in a house with his father and his brother.  (R. at 52.)  His height was 5'8" and a half, and he weighed about 300 pounds.  (R. at 54-56.)  He did not do any yard work, housework, or grocery shopping.  (R. at 52-53.)  Plaintiff did not cook other than to make sandwiches, and normally his father or brother did the laundry.  (R. at 53.)  He bathed himself everyday, but with difficulty.  (R. at 55.)  He could dress himself, but he had difficulty putting on his shoes and socks due to pain from his knee.  (R. at 55.)  He could lift a gallon of milk, which was about 8 pounds, but could not carry a 20-pound bag of potatoes.  (R. at 54.)  Plaintiff could not sit longer than 10 to 15 minutes because his lower back would start to hurt, and the pain from his back was constant.  (R. at 53-54.)  He could stand only for about 10 to 15 minutes, could walk "[a]bout as long as a football

field," and used a cane to walk.  (R. at 54-56.)  Plaintiff could not walk up or down a flight of stairs because it would take all day; his knee did not fully extend out and it also did not bend too much.  (R. at 58.)  He could not walk on an uneven surface due to pain.  (R. at 58.)  Plaintiff testified that his left knee and right ankle swelled everyday, and that he took 800 milligrams of Ibuprofen and a muscle relaxer daily for pain.  (R. at 51-52, 59.)  The medication relieved him from pain for only an hour or so, but they did not relieve him of the swelling.  (R. at 60.)

Plaintiff was depressed about the fact that he could not work, walk a lot, clean, exercise, and play sports.  (R. at 55.)  He had problems concentrating and suffered memory loss due to a concussion he had suffered from a car accident.  (R. at 62-63.)  He spent time watching television but could not concentrate enough to watch a 30-minute television program; he just sat in front of the television.  (R. at 55, 63.)  Plaintiff was a deacon of his church and attended the church three days a week.  (R. at 56, 62.)  He also had a girlfriend whom he saw every weekend.  (R. at 61.)  He got along well with his father, brother, sister, girlfriend, and the church congregation, but he became irritable and angry due to constant pain.  (R. at 61-62.)

Plaintiff had auditory and visual hallucinations.  (R. at 60-61.)  Plaintiff heard voices and saw his grandmother, uncle, and brother in the house he was living; they died in that house.  (*Id.*)  He received treatment at Metrocare.  (R. at 52, 60.)  He took Citalopram and Risperdal he received from Metrocare, but Risperdal did not help him stop hearing voices.  (R. at 60.)

###   b.    VE Testimony

A vocational expert (VE), also testified at the hearing.  (R. at 63-65.)  He classified Plaintiff's past relevant work as a telephone solicitor (semi-skilled).  (R. at 63.)  The ALJ asked the VE to opine whether a hypothetical person with Plaintiff's age, education, and work history could

perform his past relevant work with the following limitations: lift and carry 10 pounds occasionally and a little less than 10 pounds frequently; stand or walk two hours and sit for six hours out of an eight-hour day; push and pull, limited to the weights given; less than occasional climbing stairs and ramps; never climb ropes, ladders, and scaffolds; never kneel, crouch, and crawl; require the use of a cane for ambulation; and understand, remember and carry out detailed, but not complex instructions.  (R. at 63-64.)  The VE testified that the hypothetical person could perform Plaintiff's past relevant work.  (R. at 64.)  The ALJ asked the VE whether there were other jobs that could be performed with the same limitations, and the VE answered in the affirmative and listed the following examples of sedentary, unskilled jobs: (1) a clock and watch assembler, with 13,000 jobs nationally and 1,300 jobs in Texas; (2) a lense inserter, with 46,000 jobs nationally and 2,300 in Texas; and (3) an order clerk, food and beverage, with 167,000 jobs nationally and 7,000 in Texas.  (R. at 64.)

The ALJ then modified the hypothetical, limiting the individual to limited understanding, remembering, and carrying out routine step instructions, but able to respond appropriately to supervisor and coworkers in jobs not requiring independent decision making.  (R. at 64.)  The VE opined that it would eliminate the past relevant work and just leave the sedentary unskilled occupational base with the same examples.  (R. at 65.)  The VE testified that his testimony was consistent with the dictionary of occupational titles (DOT).  (*Id.*)  In response to a question by the ALJ, the VE stated that the hypothetical person could not maintain competitive employment if he missed two or more days of work a month.  (*Id.*)

## C.    ALJ's Findings

The ALJ issued his decision denying benefits on December 16, 2011.  (R. at 31-43.)  At step one, the ALJ found that Plaintiff had not engaged in substantial gainful activity since March 1, 2010,

his application date.  (R. at 36.)  At step two, the ALJ found that Plaintiff had severe combination of impairments as following: "degenerative joint disease of the left knee and right ankle, morbid obesity, and major depressive disorder.  (*Id.*)  At step three, the ALJ found that Plaintiff's impairments did not meet or medically equal the severity of an impairment listed in the regulations. (*Id.*)

Before proceeding to step four, the ALJ determined that Plaintiff had the following RFC: lift and carry 10 pounds occasionally and less than 10 pounds frequently, and push or pull the weights given; stand and/or walk two hours and sit for six hours out of an eight-hour day; require use of cane for ambulation; climb stairs and ramps less than occasionally; never climb ropes, ladders, and scaffolds; never kneel, crouch or crawl; understand, remember, and carry out routine step instructions; and respond appropriately to supervisors and coworkers in jobs not requiring independent decision-making.  (R. at 37-38.)  At step four, based on the VE's testimony, the ALJ determined that Plaintiff was unable to perform any of his past relevant work.  (R. at 41.)  At step five, also based on the VE's testimony, the ALJ determined that Plaintiff could perform the jobs of clock and watch assembler, lense inserter, and order clerk for food and beverage.  (R. at 42.)  He therefore concluded that Plaintiff was not disabled at any time between his alleged onset date and the date of the ALJ's decision. (*Id.*)

## II.  ANALYSIS

### A.    <u>Legal Standards</u>

#### 1.    **Standard of Review**

Judicial review of the Commissioner's denial of benefits is limited to whether the Commissioner's position is supported by substantial evidence and whether the Commissioner

applied proper legal standards in evaluating the evidence. *Greenspan v. Shalala*, 38 F.3d 232, 236 (5th Cir. 1994); 42 U.S.C. § 405(g). "Substantial evidence is that which is relevant and sufficient for a reasonable mind to accept as adequate to support a conclusion; it must be more than a scintilla, but it need not be a preponderance." *Leggett v. Chater*, 67 F.3d 558, 564 (5th Cir. 1995) (quoting *Anthony v. Sullivan*, 954 F.2d 289, 295 (5th Cir. 1992)). In applying the substantial evidence standard, the reviewing court does not reweigh the evidence, retry the issues, or substitute its own judgment, but rather, scrutinizes the record to determine whether substantial evidence is present. *Greenspan*, 38 F.3d at 236. A finding of no substantial evidence is appropriate only if there is a conspicuous absence of credible evidentiary choices or contrary medical findings to support the Commissioner's decision. *Johnson v. Bowen*, 864 F.2d 340, 343-44 (5th Cir. 1988).

The scope of judicial review of a decision under the supplemental security income program is identical to that of a decision under the social security disability program. *Davis v. Heckler*, 759 F.2d 432, 435 n. 1 (5th Cir. 1985). Moreover, the relevant law and regulations governing the determination of disability under a claim for disability insurance benefits are identical to those governing the determination under a claim for supplemental security income. *See id*. Thus, the Court may rely on decisions in both areas without distinction in reviewing an ALJ's decision. *See id*. at 436 and n.1.

### 2.        Disability Determination

To be entitled to social security benefits, a claimant must prove that he or she is disabled as defined by the Social Security Act. *Leggett*, 67 F.3d at 563-64. The definition of disability under the Social Security Act is "the inability to engage in any substantial gainful activity by reason of any medically determinable physical or mental impairment which can be expected to result in death or

which has lasted or can be expected to last for a continuous period of not less than 12 months." 42

U.S.C. § 423(d)(1)(A).  When a claimant's insured status has expired, the claimant "must not only

prove" disability, but that the disability existed "prior to the expiration of [his or] her insured status."

*Anthony*, 954 F.2d at 295.  An "impairment which had its onset or became disabling after the special

earnings test was last met cannot serve as the basis for a finding of disability."  *Owens v. Heckler*,

770 F.2d 1276, 1280 (5th Cir. 1985).

The Commissioner utilizes a sequential five-step analysis to determine whether a claimant

is disabled:

1. An individual who is working and engaging in substantial gainful activity will not be found disabled regardless of medical findings.

2. An individual who does not have a "severe impairment" will not be found to be disabled.

3. An individual who "meets or equals a listed impairment in Appendix 1" of the regulations will be considered disabled without consideration of vocational factors.

4. If an individual is capable of performing the work he has done in the past, a finding of "not disabled" must be made.

5. If an individual's impairment precludes him from performing his past work, other factors including age, education, past work experience, and residual functional capacity must be considered to determine if work can be performed.

*Wren v. Sullivan*, 925 F.2d 123, 125 (5th Cir. 1991) (summarizing 20 C.F.R. § 404.1520(b)-(f)

(currently 20 C.F.R. § 404.1520(a)(4)(i)-(v) (2012)).  Under the first four steps of the analysis, the

burden lies with the claimant to prove disability.  *Leggett*, 67 F.3d at 564.  The analysis terminates

if the Commissioner determines at any point during the first four steps that the claimant is disabled

or is not disabled.  *Id*.  Once the claimant satisfies his or her burden under the first four steps, the

burden shifts to the Commissioner at step five to show that there is other gainful employment

available in the national economy that the claimant is capable of performing. *Greenspan*, 38 F.3d at 236. This burden may be satisfied either by reference to the Medical-Vocational Guidelines of the regulations or by expert vocational testimony or other similar evidence. *Fraga v. Bowen*, 810 F.2d 1296, 1304 (5th Cir. 1987). After the Commissioner fulfills this burden, the burden shifts back to the claimant to show that he cannot perform the alternate work. *Perez v. Barnhart*, 415 F.3d 457, 461 (5th Cir. 2005). "A finding that a claimant is disabled or is not disabled at any point in the five-step review is conclusive and terminates the analysis." *Loveland v. Bowen*, 813 F.2d 55, 58 (5th Cir. 1987).

**B.    Issues for Review**

Plaintiff raises three issues for review:

1.    The ALJ failed to weigh every medical opinion in evidence;

2.    The ALJ failed to consider all of Plaintiff's severe impairments; [and]

3.    The ALJ's RFC failed to include all of Plaintiff's functional limitations.

**C.    Medical Opinions**

Plaintiff argues remand is required because the ALJ and the Appeals Council "failed to weigh all of the medical opinions in the administrative record." (Doc. 13 at 11.) Although Plaintiff's issue is asserted in general terms, he only specifically addresses the ALJ's failure to weigh the opinion of Dr. Perry, the consultative examiner. (Doc. 13 at 11-12.)

State agency medical or psychological consultants (SAMC) such as Dr. Perry are considered experts in the Social Security disability program, and their opinions may be entitled to great weight if they are supported by the evidence. *Rawls v. Astrue*, No. 4:10-CV-71-BJ, 2011 WL 725279, at *11 (N.D. Tex. Mar. 2, 2011). Although an ALJ is solely responsible for assessing a claimant's

RFC, he must consider and evaluate any opinion by an SAMC regarding the claimant's RFC. *See* Social Security Ruling (SSR) 96-6p, 1996 WL 374180, at *4 (S.S.A. July 2, 1996). Specifically, "RFC assessments by [SAMCs] . . . are to be considered and addressed in the [ALJ's] decision as medical opinions from nonexamining sources about what the individual can still do despite his or her impairment[s]" and "are to be evaluated considering all the factors . . . for considering opinion evidence" outlined in 20 C.F.R. § 404.1527(c). *Id.* The ALJ is not required to expressly discuss each finding by an SAMC or discuss each factor listed in 20 C.F.R. § 404.1527(c), however, because such a detailed analysis applies only to the ALJ's rejection of a treating sources' uncontradicted opinion. *See Newton v. Apfel*, 209 F.3d 448, 456-58 (5th Cir. 2000). The ALJ also "must explain the weight given to these opinions in [his] decision[]." SSR 96-6p, 1996 WL 374180, at *4.

### 1.     Consideration of Dr. Perry's Opinion

Here, the ALJ explicitly referred to Dr. Perry by name. (R. at 39.) He specifically listed Dr. Perry's opinion on Plaintiff's limitations on work-related activities, accepted her conclusion regarding Plaintiff's "fine manual or bilateral manual dexterity", and also considered her report on Plaintiff's "below average bilateral grip strength" before concluding that Plaintiff could lift and carry 10 pounds occasionally and less than 10 pounds frequently.[4] (*Id.*) Thus, the ALJ considered

---

[4]Plaintiff argues that the ALJ distorted Dr. Perry's opinion because he cited to Dr. Perry's observation on Plaintiff's bilateral grip strength rather than her lift and carry limitation in deriving a lift and carry limitation of 10 pounds occasionally and less than 10 pounds frequently. (Doc. 13 at 12.) Bilateral grip strength is relevant, at a minimum, to Plaintiff's ability to lift, push, or pull objects. *See e.g. Petersen v. Astrue*, No. 08-2154-JWL-DWB, 2009 WL 1504734, at *5 (D. Kan. May 27, 2009) (affirming the ALJ's decision, which included his observation that "[the plaintiff] alleges inability to lift, grasp, hold, push, or pull objects; however, multiple physical examinations of record reveal[] he demonstrated full or nearly full strength in the bilateral extremities, full to nearly full grip strength in the bilateral hands . . .").

all of Dr. Perry's opinions and adopted some of the limitations and implicitly rejected others.[5] *See*

*Hunt v. Astrue*, No. 4:12-CV-244-Y, 2013 WL 2392880, at *7 (N.D. Tex. June 3, 2013) ("The ALJ

is not required to discuss every piece of evidence in the record nor must the ALJ follow formalistic

rules of articulation."); *see also Walker v. Astrue*, No. 4:11-CV-680-A, 2011 WL 2989947, at *9

(N.D. Tex. June 1, 2011) ("[T]he ALJ is not required to incorporate limitations in the RFC that he

did not find to be supported in the record."). He failed to assign a specific weight to Dr's Perry's

opinion, however. This was an error. *See* SSR 96-6p, 1996 WL 374180, at *4.

### 2.      Harmless Error

The Court must consider whether the ALJ's failure to properly weigh Dr. Perry's opinion

is harmless. *See Webb v. Astrue*, No. 4:08-CV-747-Y, 2010 WL 1644898, at *11 (N.D. Tex. Mar.

2, 2010), *rec. adopted*, 2010 WL 1644697 (applying harmless error analysis to the ALJ's failure to

give weight to an SAMC's opinion). In the Fifth Circuit, harmless error exists when it is

inconceivable that a different administrative conclusion would have been reached absent the error.

*Bornette v. Barnhart*, 466 F. Supp. 2d 811, 816 (E.D. Tex. 2006) (citing *Frank v. Barnhart*, 326 F.3d

618, 622 (5th Cir. 2003)).

---

[5]Plaintiff focuses on the difference between Dr. Perry's opinion on Plaintiff's lift and carry limitation–i.e., less than 10 pounds–and the ALJ's conclusion on Plaintiff's lift and carry limitation–i.e., 10 pounds occasionally and less than 10 pounds frequently–and argues that had the ALJ accepted Dr. Perry's limitation, Plaintiff would have been found disabled because such limitation would qualify him only for less than sedentary work. (Doc. 13 at 12.) Dr. Perry's limitation, however, does not explicitly contradict the ALJ's findings because the ALJ determined that Plaintiff could lift and carry less than 10 pounds frequently. Even if the ALJ had rejected Dr. Perry's lift and carry limitation, Plaintiff's argument is unsupported by 20 C.F.R. § 404.1567(a), which defines sedentary work, in relevant part, as work that "lifts *no more than* 10 pounds at a time and occasionally lifting or carrying articles like docket files, ledgers, and small tools." *Id.* (emphasis added). Even if Plaintiff could lift and carry only less than 10 pounds, he was not automatically disqualified from taking a sedentary job. *See e.g. Johnson v. Astrue*, No. 3:10-CV-0246-D, 2010 WL 4722275 (N.D. Tex. Nov. 22, 2010) (Fitzwater, C.J.) (affirming the Commissioner when the ALJ found the claimant could do sedentary work, i.e. the claimant's past relevant work, which required lift and carry limited to less than ten pounds).

### a.      Treatment Records

Plaintiff did not submit any medical opinions from his treating or examining physician addressing his physical disability.   There was evidence of only two doctor's visits during the relevant period where Plaintiff sought treatment for pain.  (*See* R. at 213-14, 319-22.)  Further, his treatment history was routine and conservative.  (*Id.*)  On February 18, 2010 visit, Plaintiff complained of his left leg pain and received a prescription.[3]  (R. at 214.)  No other distress was noted, and no other treatment was ordered.  (*Id.*)  On June 1, 2010, Plaintiff saw Dr. Nasir at Parkland as a new patient and was prescribed essentially the same medications as during his February visit.  (R. at 319.)  Aside from an x-ray, no other treatment was ordered.  (*See* R. at 319-22.)

As for his mental impairments, Plaintiff showed significant improvement through treatment. When Dr. Brown first examined Plaintiff his functional impairment was significant, (R. at 216), but within three weeks of treatment, his functional impairment improved to moderate, (R. at 224). Plaintiff's functional impairment further improved to low or none following the Metrocare treatments.  (R. at 276, 282, 290).  As the ALJ observed, despite nurse Buju's assignment of a GAF score of 42 (which normally reflects serious impairments) on August 8, 2011 and October 17, 2011, (R. at 297, 312), Metrocare treatment records show that Plaintiff's mental status was virtually normal, (R. at 273, 279, 284, 288, 292, 302, 306).  On December 12, 2011, four days prior to the ALJ's decision, a registered nurse at Metrocare observed that Plaintiff's mental status was stable, his insight and judgment were good, his appetite was normal, and he was sleeping well.  (R. at 17-18.)

---

[3]The prescribed drugs were Maxzide, Ibuprofen, and Flexeril. (R. at 214.)

### b.    *SAMC Opinions*

Although the ALJ accorded less weight to the "Disability Determination Service physicians and psychologists[,]" their opinion was given some weight and all the SAMCs' opinions support a finding of no disability.  On Plaintiff's physical impairments, Dr. Cremona, one of the SAMCs who completed Plaintiff's physical RFC, opined that Plaintiff's asserted limitations were *wholly not supported*.  (R. at 264.)  Instead, Plaintiff could occasionally lift and/or carry 20 pounds and frequently lift and carry 10 pounds, stand and/or walk for at least two hours in an eight-hour workday, sit for a total of about six hours in an eight-hour workday, and push and/or pull the weights identified for lift and/or carry, he could climb ramp or stairs occasionally, never climb a ladder, rope, or scaffolds, frequently balance, stoop, and crouch, occasionally keel and crawl.  Plaintiff's muscle strength was 4/5 for his left leg and 5/5 for other areas tested, and his grip strength was weak, but he could handle, finger, and feel objects. (R. at 258-259, 264.) Dr. Cremona's opinion was affirmed by Dr. Fritz on October 14, 2010.  (R. at 265.)  Drs. Cremona's and Fritz's opinions tracked Dr. Perry's conclusion on Plaintiff's muscle strength and ability to handle, finger and feel objects, but differed in lift and/or carry limitations.  (*See* R. at 231, 258.)  When there are conflicts in the evidence, it is entirely within the ALJ's purview to resolve any conflicts because such conflicts are for the Commissioner, and not the courts, to resolve.  *See Masterson v. Barnhart*, 309 F.3d 267, 272 (5th Cir. 2002).  The ALJ concluded that Plaintiff could lift and carry 10 pounds occasionally and less than 10 pounds frequently.  (R. at 37.)

On Plaintiff's mental impairments, on July 21, 2010, Dr. Snapp, an SAMC, completed an MRFC and concluded that Plaintiff "can understand, remember, and carry out detailed but not complex instructions, make decisions, attend and concentrated [sic] for extended periods, accept

instructions, and respond appropriately to changes in routine work setting." (R. at 239-41.) Dr. Snapp also completed a PRTF and concluded that Plaintiff's "alleged limitations due to depression are partially supported by the medical and other evidence of record[, but his] alleged severity and limiting effects from the impairment are *not wholly supported*." (R. at 243-55.) Dr. Snapp's assessments were affirmed by Dr. Campa on October 8, 2010. (R. at 266-67.) Thus, the SAMCs' opinions support the finding of no disability, because although they were given less weight they were not rejected and their conclusions were strongly against the finding of disability. (*See* R. at 255, 264.)

### c.     *Plaintiff's Representations*

Plaintiff's own words support the ALJ's conclusion as well. Plaintiff testified at the hearing that he could carry a gallon of milk, but could not carry a 20 pound potato sack.[4] (R. at 54.) Plaintiff also testified to his inability to do housework or go shopping, but in his Social Security Function Report he stated that he did laundry, iron, and vacuumed–which is presumably heavier than 10 pounds–the house and he went for clothes and grocery shopping once a month. (R. at 169-70.) He further stated that he could "only lift 40 pounds[.]" (R. at 172.) On October 19, 2011, just one week prior to the hearing, Plaintiff told one of the mental health professionals at Metrocare that his strengths were his enjoyment in dressing himself, shopping, cooking, going to church, and singing. (R. at 318.) These admissions support the finding that Plaintiff's asserted limitations were not as serious as he had portrayed.

Here, even if the ALJ had articulated the specific weight he gave Dr. Perry's opinion, it would not have changed the outcome of the disability determination. *See Webb*, 2010 WL 1644989,

---

[4]The ALJ's decision stated that a gallon of milk was about 10 pounds. (R. at 38.) At the hearing, however, it was noted by Plaintiff's attorney that a gallon of milk was about eight pounds. (R. at 54.)

at *11.   Because Plaintiff's treatment records, SAMCs' opinions, and even Plaintiff's own representations support the ALJ's decision, it is inconceivable that a different administrative conclusion would have been reached absent the error.   *See Bornette*, 466 F. Supp. 2d at 816. Because the ALJ's failure to weigh Dr. Perry's opinion would not have changed the outcome of the disability determination, remand is not required.   *See Morris v. Bowen*, 864 F.2d 333, 336 (5th Cir. 1988) (per curiam) ("[E]ven if such an impropriety exists, it does not render the ALJ's determination unsupported by substantial evidence, and thus does not prejudice [the claimant's] substantive rights.").

### D.     Post-Traumatic Stress Disorder

Plaintiff next argues that the ALJ erred by not finding his post-traumatic stress syndrome (PTSD) to be a severe impairment.  (Doc. 13 at 13.)

"The ALJ has a duty to develop facts fully and fairly, but reversal is appropriate only if the applicant shows that he was prejudiced."   *Andablo v. Astrue*, No. 3:12-CV-0560-D, 2012 WL 4893215, at *4 (N.D. Tex. Oct. 16, 2012) (Fitzwater, C.J.) (quoting *Ripley v. Chater*, 67 F.3d, 552, 557 (5th Cir. 1995)) (internal quotation marks omitted).  Further, "[t]he ALJ's duty to investigate . . . does not extend to possible disabilities that are not alleged by the claimant or to those disabilities that are not clearly indicated on the record."   *Leggett*, 67 F.3d at 566.

Here, Plaintiff did not raise this issue before the ALJ; he first asserted PTSD as a limitation in his brief to the Appeals Council.  (R. at 210); *see Andablo v. Astrue*, No. 3:12-CV-0560-D, 2012 WL 4893215 (N.D. Tex. Oct. 16, 2012) (finding that the ALJ did not err in failing to consider education or intelligence as a possible limitation when the claimant first asserted the limitation in his brief to the Appeals Council because the ALJ's duty did not extend to investigating possible

disabilities not alleged by the claimant).  Although Dr. Brown noted the potential relation between Plaintiff's symptoms and PTSD, an actual diagnosis of PTSD did not appear in the record until August 8, 2011, when a nurse at Metrocare wrote it in her report.  (R. at 297.)  There is also no evidence that Plaintiff sought separate treatment for PTSD.  *See Sweeten v. Astrue*, No. 3:11-CV0934-G-BH, 2012 WL 3731081 (N.D. Tex. Aug. 13, 2012) (finding no error in the ALJ's failure to consider anxiety as a severe impairment where the plaintiff failed to claim anxiety as an impairment before the ALJ, the medical records showed only an occasional display of symptoms, and she never sought treatment for anxiety).  The ALJ's failure to find Plaintiff's PTSD a severe impairment was not an error when Plaintiff failed to raise it before the ALJ, and the medical record only shows sporadic mention of the condition.  *Id.*

Further, the ALJ satisfied his duty because even though the ALJ may not have addressed the PTSD by name, he did address the symptoms that Plaintiff asserts were associated with it.  Dr. Brown suggested that Plaintiff's struggle with sleep was probably caused by his PTSD.  (R. at 221.) The ALJ acknowledged Plaintiff's inability to sleep in his decision, noting that it likely impacted Plaintiff's ability to concentrate.  (R. at 40.)  The ALJ addressed Plaintiff's social issues and rejected his assertion that they were caused by his PTSD (*see* doc. 13 at 15), because Plaintiff had no relational problems with his father, brother, and girlfriend, and was able to serve as a deacon in his church.  (R. at 39.)  Thus, whether Plaintiff specifically raised the PTSD as a disabling condition, the ALJ's determination would not have changed.  *See Land v. Astrue*, No. H-11-02186, 2012 WL 9392189, at *8 (S.D. Tex. Oct. 9, 2012) ("[T]he ALJ's determination of whether [the claimant] was able to work would not have changed had the ALJ properly described [the claimant's] diagnosis as "schizoaffective disroder" rather than "schizophrenia, paranoid type," because all of the remaining

evidence in the medical record would have been exactly the same, and . . . substantial evidence supported the ALJ's determination that [the claimant] was not disabled."). Plaintiff failed to identify any evidence that would have caused a different result. *See Ball v. Astrue*, No. 1:06-CV-138-BI, 2008 WL 836418, at *15 (N.D. Tex. Mar. 26, 2008) ("Plaintiff did not raise the issue of his mental impairment, and although the ALJ considered a mental impairment, Plaintiff has identified no evidence that he could or would adduce that would cause a different result."). The ALJ did not err, and remand is not required.

**E.   Functional Limitations**

Plaintiff next asserts that the ALJ failed to consider all of his functional limitations. (Doc. 13 at 15.)   Specifically, he asserts that the ALJ failed to properly consider his limitation on maintaining concentration. (Doc. 13 at 15-16.)   Plaintiff's argument is two-fold: (1) the ALJ erred when he did not find that he had a marked limitation on maintaining concentration; and (2) the ALJ erred because his RFC finding did not incorporate his concentration limitation. (Doc. 13 at 16.)

Plaintiff first asserts that when the ALJ specifically ruled that his ability to concentrate was more severe than what the SAMCs opined, the ALJ should have concluded that he had a marked limitation on his ability concentrate because one of the SAMCs noted he had a moderate limitation. (*Id.*)   "[N]othing in the commissioner's regulations or rulings that [sic] requires an ALJ to make findings concerning each of the limitations listed [in Section I] on the 'Summary Conclusions' portion of the [MRFC] forms utilized by the SAMCs in assessing a claimant's mental residual functional capacity." *Huber v. Astrue*, No. 4:07-CV-477-A, 2008 WL 4694753, at *7 (N.D. Tex. Oct. 22, 2008).   In fact, "Section I of the MRFC, which contains the limitations that [Plaintiff] claims should not have been left out of the RFC determination, is merely a worksheet to aid [the

medical consultant] in deciding the presence and degree of functional limitations and the adequacy of documentation and does not constitute the RFC assessment. . . . Instead, it is Section III that contains the actual mental RFC assessment." *Skiles v. Colvin*, No. 4:12-CV-418-Y, 2013 WL 3486921, at *8 (N.D. Tex. Jul. 11, 2013) (citing to the Commissioner's Programs Operations Manual System §§ DI 24510.060B.2, DI 24510.060B.4).

Here, the ALJ stated in his decision that he gave less weight to the SAMCs' opinions.  (R. at 40.)  Specifically, he noted that "[m]edication side effects, sleep problems (for which the claimant missed an appointment for a sleep study), and pain from his physical condition likely interfere with the claimant's concentration more than the reports of the DDS physicians and psychologists suggest." (*Id.*)  Dr. Snapp, an SAMC who completed Plaintiff's MRFC assessment, checkmarked in Section I–the Summary Conclusion section of the MRFC form–that Plaintiff was moderately limited in his "ability to maintain attention and concentration for extended periods[.]" (R. at 239.) In Section III, however, Dr. Snapp opined that Plaintiff could "understand, remember, and carry out detailed but not complex instructions, make decisions, attend and *concentrate[] for extended periods*, accept instructions, and respond appropriately to changes in routine work setting."  (R. at 241.)  As found in *Skiles,* the checkmarked moderate limitation on Plaintiff's concentration was not Dr. Snapp's medical opinion, but only a worksheet to aid him, because he actually opined that Plaintiff could concentrate for extended periods.  (R. at 239, 241); *see Westover v. Astrue*, No. 4:11-CV-816-Y, 2012 WL 6553102, at *6 (N.D. Tex. Nov. 16, 2012) (noting the difference between the opinions in Sections I and III).  This conclusion is further supported by Dr. Snapp's PRTF form. (R. at 243-56.)  There, Dr. Snapp concluded that Plaintiff had a mild limitation on maintaining concentration, persistence or pace. (R. at 253.)  The ALJ's conclusion that Plaintiff had a moderate

limitation on his ability to concentrate is more severe than Dr. Snapp's opinion, and there was no error. *Skiles*, 2013 WL 6553102, at *8.

Plaintiff next argues that his moderate limitation in maintaining concentration, persistence, or pace that the ALJ found at step three should have been reflected in the ALJ's RFC determination. (Doc. 13 at 16.)  The ALJ explained in his decision, however, that "[t]he limitations identified [in the mental impairment discussion] are not a residual functional capacity assessment but are used to rate the severity of mental impairments at step three of the sequential evaluation process[,]" which is broader in scope than the work-related limitations addressed at steps four and five.  (R. at 37.) "[T]he regulations do not specifically require the ALJ to find that the limitations found in evaluating the mental impairment must be word-for-word incorporated into . . . the RFC determination[.]" *Patterson v. Astrue*, No. A 108-CV-109-C, 2009 WL 3110205, at *5 (N.D. Tex. Sept. 29, 2009). Thus, there was no error when the ALJ did not incorporate the mental limitation from step three into the RFC determination, and remand is not required.  *See id.*

## III.  CONCLUSION

The Commissioner's decision is **AFFIRMED**.

**SO ORDERED on this 31st day of March, 2014.**

_____
IRMA CARRILLO RAMIREZ
UNITED STATES MAGISTRATE JUDGE

-23-